ALLEN v. ARKENBURGH et al.

(Supreme Court, Appellate Division, First Department. March 13, 1896.)

1. ORAL TRUST UPON REALTY—PURCHASE BY TENANT IN· COMMON.
An oral promise by a tenant in common to buy in the land at partition sale and hold the same for the joint benefit of himself and his cotenants, who are his nephews and nieces, until it can be sold to greater advantage, the promisees agreeing not to bid at the partition sale, impresses on the land so purchased a trust which equity will enforce.

2. SAME—RIGHTS OF COTENANT.
Where a tenant in common buys in the land at partition sale on an oral agreement to hold the same for the joint benefit of all the parties interested, a recognition of the trust by the promisor's executors, and a sale by them in accordance therewith, entitles the promisees to share in the proceeds of the sale.

Appeal from special term, New York county.

Action by Jeanette A. Allen against Eliza J. Arkenburgh, individually and as executrix under the will of Robert H. Arkenburgh, deceased, impleaded with Oliver M. Arkenburgh, individually. and as executor under said will, to enforce specific performance of a contract relating to land. From a judgment for plaintiff, defendant Eliza J. Arkenburgh appeals. Affirmed.

The defendants are the executor and executrix of Robert H. Arkenburgh, deceased. In November, 1878, the decedent, the plaintiff, Jeanette A. Allen, Robert H. Kinsey, Thomas J. Kinsey, and Elizabeth J. Adams each owned an undivided one-fifth interest in certain property in the city of Rahway, N. J., as tenants in common. The decedent was the uncle of the plaintiff and the other parties named. Thereafter a suit was begun in the court of chancery of New Jersey to partition the property, and in July, 1885, a decree was entered directing a sale of the premises. Elizabeth J. Adams died prior to this decree, and her interest descended to Robert H. A. Adams, an infant, who was represented by Mr. Arkenburgh's son, the present defendant executor, as guardian. At· this time circumstances were such that a sale would have been at a great sacrifice, and the decedent made a certain verbal agreement respecting the premises which is the basis of the present suit. The facts are all undisputed. But two witnesses were called at the trial, both in favor of the plaintiff. They were the defendant Oliver M. Arkenburgh, and Joseph W. Allen, the plaintiff's husband. Mr. Arkenburgh testified: "I know the premises described in the complaint, and had a conversation with my father about them the latter part of January, 1889, at his office, No. 78 Broad street, this city, at which the plaintiff's husband, Joseph W. Allen, and Robert H. Kinsey were also present. He said that, if the Kinseys would not bid on the property that was put up by the master at the sale that was about to take place, he would buy it in, and would pay all the assessments and taxes on it, and that he should ask simply to have his money refunded, with interest, and his one-fifth which he owned in it. The balance he would give to the parties in interest. Mr. Kinsey said he was satisfied to put himself in the hands of his uncle, and I, representing my nephew, Adams, was perfectly willing to do the same. Mr. Allen represented the plaintiff, and said he thought the plaintiff would be satisfied. My father and I went to Rahway, February 2, 1889, and had a meeting at Mr. Allen's house, where he, Mr. Arkenburgh, the plaintiff, Mr. Allen, my nephew, Adams, and myself were present. This was about two hours before the sale. At this meeting my father said that he would buy the property and do all he could to reduce the assessments on it, dividing any surplus after he was reimbursed, and after the interest was taken out, among his nephews and nieces,—to the plaintiff one-fifth, Thomas J. Kinsey one-fifth, Robert H. Kinsey one-fifth, and Robert H. A. Adams one-fifth. My father and I attended the sale by the master.

The premises were sold, and I bid them in for my father. The title was taken in his name. There were present at the sale all the Kinseys, including the plaintiff, and a Mr. Vail, a gentleman named Woodruff, and quite a number that I did not know at all. There was no bid for the property other than mine. I paid the master in chancery $150." Mr. Allen testified: "I was present at the conversation with Robert H. Arkenburgh, now deceased, at my house, there, February 2, 1889. He stated that he came there to buy a piece of property advertised for sale, and it was a point to look out for the interest of his sister's heirs, his sister's children. He spoke of their several interests. Q. Did he request the other persons in interest not to bid at the sale? A. Yes. Q. Did you go to the sale? A. I did. Q. Did anybody bid there except Mr. Arkenburgh? A. No, sir." The property thus obtained was held by Mr. Arkenburgh until his death, which occurred on the 20th day of September, 1890. Thereafter his will was admitted to probate, and letters were duly issued to the defendants. Since then the defendants fully recognized the agreement. On this head the executor testified as follows: "I told Mr. Allen that I proposed to carry out my father's agreement to the letter. By 'agreement,' I referred to what I have testified to above. I had a conversation with the Kinseys to the same effect. Afterwards, when I found a customer for the property, I saw all the Kinseys, and got their consent to the sale of it. I also had a conversation with my codefendant [the executrix] prior to the sale of the property. She said she wanted the property sold, and the Kinseys to have their share of it, and I told her I thought it should be sold and settled up. I think there was another conversation with my mother about the property when Robert H. Kinsey was present, at 78 Broad street, when she spoke to the same effect,—that she wanted them to have their share of the property when sold." The property was sold on the 20th of July, 1894, nearly four years after Mr. Arkenburgh's death, under a power of sale contained in his will. The executor in his answer admits the trust alleged in the complaint. The executrix in her answer ignores it.

Argued before VAN BRUNT, P. J., and BARRETT, O'BRIEN, RUMSEY, and INGRAHAM, JJ.

C. E. Souther, for appellant.

Frank W. Arnold, for respondent.

BARRETT, J.   The question presented is whether the circumstances attending the agreement in question are such as to impress a trust upon the land which will entitle the plaintiff and the other interested parties to share in the proceeds.   The defendant executrix relies upon the statute of frauds, while the plaintiff claims that Mr. Arkenburgh took the property as a trustee for all the tenants; and she invokes the doctrine that the statute may not be used to shield a fraud.   It is conceded that the mere breach of a verbal agreement is not, ordinarily, such a fraud as is contemplated by the doctrine last stated.   Levy v. Brush, 45 N. Y. 589; Wheeler v. Reynolds, 66 N. Y. 227.   It is not enough that one person has relied upon the promise of another with regard to the purchase of a piece of property.   The party seeking relief in such a case must go further, and show a change of position on his part, due to such reliance.   He must prove, in fact, the elements of an estoppel in pais.   As was said in Wheeler v. Reynolds:

"The promisee must have been induced, at the instance of the promisor, to incur some expense or perform some act which he otherwise would not have done."

But this rule applies in its full force only where the parties sustain no trust or confidential relations to each other, or where they are

simply contracting parties in the ordinary sense. It does not apply where there is a trust or confidential relation with regard to the property itself, where there is a community of interest between the owners, and where the promise of one relates to the vested interests of all. The plaintiff here had a vested interest in the property in question, and so had the deceased. So, too, had the other tenants in common. There was a community of interest upon the part of all concerned. It was with reference to this community of interest that the agreement was made. The deceased did not assert his independent right to purchase the property for his own benefit, but avowed his purpose to buy it for the benefit of all parties in interest, including himself. That was what he offered, and that was what they accepted; and he coupled this offer with the suggestion that they should not bid against him at the sale. In other words, he avowed a trust relationship with regard to the property, based partly upon community of interest, partly upon ties of blood. It was a plain acknowledgment that there was, as said by Miller, J., in Rothwell v. Dewees, 2 Black, 619, "a community of interest in a common title, which created such a relation of trust and confidence" between him and his nephews and nieces, one of them an infant, that it would be inequitable to permit him to "do anything to the prejudice of the others in reference to the property so situated." The authorities make this clear distinction between the purchase of property by ordinary contracting parties, and the acquisition of joint or common interests, already vested in several persons, by one of their number for the benefit of all.

In Van Horne v. Fonda, 5 Johns. Ch. 407, Chancellor Kent said:

"Community of interest produces a community of duty, and there is no real difference, on the ground of policy and justice, whether one cotenant buys up an outstanding incumbrance, or an adverse title to disseise and expel his cotenant. It cannot be tolerated, when applied to a common subject, in which the parties had an equal concern, and which created a mutual obligation to deal candidly and benevolently with each other, and to cause no harm to their joint interests."

The learned chancellor admitted that there might be a particular case in which a tenant in common could buy in an outstanding title for his own benefit, but held that this could not be done where two were in possession under an imperfect title, derived by devise from a common ancestor.

Mitchell v. Reed, 61 N. Y. 123, was an action between partners, but the rule there laid down was held to be applicable to tenants in common. · Speaking of the rule which declares a partner to be a trustee as to the renewals of a lease for a term commencing after the dissolution of the firm, Dwight, C., said (pages 138, 139):

"On principle, in many cases it is of but little consequence whether the partnership is dissolved or not before the renewal, since, if the former partners become tenants in common, the result is the same."

And, in summing up his conclusions, he says (pages 139, 140):

"It cannot necessarily be assumed that the renewal can be taken by an individual member of the firm, even after dissolution. The former partners may still be tenants in common, or there may be other reasons of a fiduciary nature why the contract cannot be entered into."

In Knolls v. Barnhart, 71 N. Y. 474, Chief Judge Church stated the facts and the principle applicable thereto as follows:

"The possession of the widow as dowress and as guardian in socage of the minor children was as tenant in common with all the heirs. She could not buy in the contract or title for her individual benefit. She occupied a fiduciary relation to the heirs, which would prevent her purchasing for her individual benefit. The general rule is that one tenant in common cannot purchase in an outstanding claim or title to the exclusion of his cotenant."

In Carpenter v. Carpenter, 131 N. Y. 101, 29 N. E. 1013, the defendants, who were tenants in common with the plaintiffs, instigated the foreclosure of mortgages on the common property, although they had in their hands funds sufficient to pay the interest due, and bought in at the sale. It was held that they were trustees for all interested. Andrews, J., said (pages 109, 110, 131 N. Y., and page 1013, 29 N. E.):

"If the foreclosure of the mortgages was a proceeding hostile to the defendants, and they had not been in default, and their purchase was made of necessity, to protect their own rights, with full knowledge of the situation on the part of the plaintiffs, the moral, and perhaps the legal, aspect of the case would be altered. But to permit the plaintiffs, all but two of whom were infants, to be cut off by a proceeding instigated by the defendants for that very purpose, and in the absence of any effort on their part to avert the danger, and when they were in actual possession of the common property, receiving the rents and profits, is not a mere ethical grievance, but one which the law will recognize and redress."

On the other hand, Streeter v. Shultz, 45 Hun, 406 (affirmed without opinion in 127 N. Y. 652, 27 N. E. 857), upholds the right of the tenant in common to deal with the property, under the special circumstances therein disclosed. There the defendant bought in the property at a foreclosure sale under a mortgage executed by the plaintiff alone prior to the defendant's acquisition of his interest. "There was no arrangement between Shultz and plaintiff that Shultz was to buy for joint benefit." 45 Hun, 407. The sale was open and public, and defendant paid a fair price. There was not a fact or circumstance in the case, except the joint relation, upon which to found the action. It was held that the relation of tenants in common is not such a strict trust relation as would incapacitate one tenant from purchasing for his individual benefit. The application of the rule may vary with the variation of the facts, but the general rule may well be stated, in the language of Judge Story, in Baker v. Whiting, 3 Sumn. 475, Fed. Cas. No. 787, that a court of equity would indulge the presumption that a tenant in common acted as a common agent for the common benefit of all the proprietors, since, in that way, he may promote the true interests of all. "Indeed," as that learned judge further observed, "all acts done by one tenant in common are presumed to be done for the interest of all the tenants, and in conformity to their rights, until an adverse claim is notoriously set up, and established by competent proofs."

When, in addition to this presumption, we have the ties of blood, and the distinct promise that the uncle tenant in common would purchase for the benefit of the nephews and nieces tenants in common, and would protect his junior and infant relatives, there can

be no doubt of the propriety of applying the trustee rule. It would be grossly unconscionable to permit the trustee tenant in common, under such circumstances, to keep the property, and deprive the cestuis que trustent tenants in common of all interest therein. It is sufficient, to effect the trust purchase, that it was not made independently, in the right of the purchaser tenant in common, but was made in the interest and for the benefit of all who were possessed of the community of interest. The community of interest principle is, however, here accentuated by the family relationship. We must not treat the case as though it rested independently upon this blood relationship. It is enough that that relationship colors and gives added force to the other doctrine. When combined, the trust result is conclusively established, and we may apply to the exceptional facts the rule which was laid down in Wood v. Rabe, 96 N. Y. 414, and followed in Goldsmith v. Goldsmith, 145 N. Y. 313, 39 N. E. 1067, that:

"Where a person, through the influence of a confidential relation, acquires title to property, or obtains an advantage which he cannot conscientiously retain, the courts, to prevent the abuse of confidence, will grant relief."

If Mr. Arkenburgh had asserted his right, and expressed his intention, to purchase upon his own individual account, a different question would be presented. That would have been "candid" but not "benevolent." If he had remained silent, and simply purchased for himself, still another question would have been presented. That would neither have been candid nor benevolent. The precise question with which we have to deal is whether he can secure the property for himself, to the exclusion of his cotenants and of his sisters' children, by a pretense of both candor and benevolence. There can surely be but one answer to such a question. Equity will not permit it.

There is still another fact which entitles the plaintiff to relief. The trust was executed by Mr. Arkenburgh's representatives. They were fully aware of the agreement, and they distinctly recognized it as binding upon them. They did not sell the property in the right of the heirs, but in the right and interest of the tenants in common. They sought the consent of these tenants in common before they made the sale, and throughout the entire transaction they treated their power as impressed with the trust. Under such circumstances, equity will impress a lien upon the proceeds of the sale, which, being personalty, are exempt from the operation of the statute. Bork v. Martin, 132 N. Y. 280, 30 N. E. 584. In the case cited the defendant came into the possession of real property upon a parol agreement to hold it subject to plaintiff's direction. He was requested to convey to third parties, and refused, unless he should receive the purchase money. Thereupon the plaintiff advanced the amount, paid it to the defendant's wife, and the defendant gave a deed. The plaintiff at once sued for and recovered the amount of the payment. Landon, J., speaking for the court, said:

"Assuming that the land was conveyed to the defendant upon an oral trust, invalid under the statutes of frauds and of uses and trusts, yet it was lawful

for him to perform it, and he has performed it so far as it required him to dispose of the land. Equity approves his performance, so far as he has performed, and, as the statutes referred to no longer apply, there is no law which he can invoke to shield him from the full performance of his duty." Pages 284, 285, 132 N. Y., and page 584, 30 N. E.

The exigencies of the present case do not require the application of the extreme doctrine enunciated in that case. There, indeed, the court held that the disposition of the property was an execution of the trust, even when the alleged trustee ex maleficio insisted that the property was his own, and that the sale was for his own sole use and benefit. Here we have the reverse of this assertion. Here the trustee's legal representatives recognized the trust, and executed it loyally. They had a right to thus recognize it, and they have only done their duty in its execution.

The trust, therefore, having been fairly and frankly executed, and the proceeds of its execution being in the hands of the defendants for distribution, such distribution was properly decreed. It follows, upon both grounds, that the judgment should be affirmed, with costs.

VAN BRUNT, P. J., and O'BRIEN and INGRAHAM, JJ., concur. RUMSEY, J., concurs in result.